UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

TestQuest, Inc.,

Plaintiff,

v.

Jay LaFrance,

Defendant.

Civil No. 02-288 (PAM/SRN)

REPORT AND RECOMMENDATION

---

Joseph W. Hammell, Esq. and Todd W. Schnell, Esq., on behalf of Plaintiff.

Scott S. Payzant, Esq., on behalf of Defendant.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came before the undersigned United States Magistrate Judge on February 20, 2002, on Plaintiff's Motion to Remand (Doc. No. 2) and Defendant's Motion to Stay, or in the alternative to Transfer Case (Doc. No. 5). These motions have been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636 and Local Rule 72.1(c). For the reasons set forth below, this Court recommends that Plaintiff's Motion to Remand be granted, and Defendant's Motion to Stay, or in the alternative to Transfer Case be denied.

## I PLAINTIFF'S MOTION TO REMAND

### A. Procedural Background.

On January 11, 2002, Jay LaFrance (LaFrance) filed a lawsuit against TestQuest, Inc. (TestQuest) in California Superior Court, San Diego County, seeking declaratory relief regarding his rights and obligations under the parties' Inventions Agreement. (Affidavit of Scott S. Payzant

MAR 26 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

(Payzant Aff.) ¶ 2.) On January 24, 2002, TestQuest served and filed a Verified Complaint (Complaint) in Minnesota District Court, Hennepin County, Fourth Judicial District. (Complaint.) The Complaint contains claims for: (1) breach of a noncompetition agreement; (2) misappropriation of trade secrets in violation of Minn. Stat. § 325C.01 et seq.; and (3) unfair competition. Id. Also on January 24, 2002, TestQuest sought a temporary restraining order (TRO). (Affidavit of Joseph W. Hammell (Hammell Aff.) ¶ 10.) On January 25, 2002, the Minnesota District Court issued a TRO: (1) prohibiting LaFrance from using any of TestQuest's confidential information; (2) ordering him to cease all employment on behalf of his company Wireless Automated Verifications Systems (WAVS) involving products and services which compete with TestQuest; and (3) prohibiting him from soliciting any business from any past or present TestQuest customers. (Payzant Aff. ¶ 4.)

On January 25, 2002, TestQuest was served with LaFrance's California suit. (Hammell Aff. ¶ 12.) Also on January 25, 2002, TestQuest removed the California suit to the United States District Court for the Southern District of California, alleging diversity jurisdiction pursuant to 28 U.S.C. § 1332. (Payzant Aff. ¶ 5.)

On January 31, 2002, LaFrance removed the Minnesota suit to this Court, alleging diversity jurisdiction pursuant to 28 U.S.C. § 1332. (Petition for Removal.) On February 1, 2002, LaFrance sought an ex parte order preventing TestQuest from proceeding with the Minnesota suit. (Hammell Aff. ¶ 13.) After refusing to issue an ex parte order, the California Federal District Court conducted a hearing, and subsequently denied LaFrance's request for a restraining order. Id.

On February 11, 2002, TestQuest filed a Motion to Remand the Minnesota suit. Also on

February 11, 2002, LaFrance filed a Motion to stay the Minnesota suit pending the outcome of the California suit, or in the alternative, to transfer it to California for consolidation.

**B. Factual Background.**

**1. Facts Relevant to LaFrance's Employment Status.**

TestQuest is a Minnesota corporation headquartered in Chanhassen, Minnesota. (Complaint ¶ 1.) In March of 1999, LaFrance began discussing potential employment with TestQuest. (Affidavit of Jay LaFrance (LaFrance Aff.) ¶ 3.) On March 17, 1999, TestQuest presented LaFrance with a written employment agreement. Id. Section 5 of the employment agreement stated "[a]s a condition to Executive's employment by the Company, Executive shall execute the Company's standard Inventions Assignment, Non-disclosure and Non-competition Agreement." (Payzant Aff.; Exh. B.) LaFrance was not provided with a copy of the Inventions Agreement at that time. (LaFrance Aff. ¶ 3.) TestQuest states that on March 25, 1999, following negotiations back and forth, LaFrance signed a final version of the employment agreement (1999 Employment Agreement), and was hired as Vice President of Sales for TestQuest in Minnesota. (Complaint ¶¶ 9-11 and Exh. A.) LaFrance states that March 25, 1999 was his first day of work, but that he actually signed the 1999 Employment Agreement on March 29, 1999, and was asked to date his signature March 25, 1999 to correspond with his first day of work. (LaFrance Aff. ¶ 5.)

**1999 Employment Agreement**

Section 7.03 of the 1999 Employment Agreement provides as follows:

> Any action at law, suit in equity, or judicial proceeding arising directly, indirectly, or otherwise in connection with, out of, related to or from this agreement or any provision hereof, shall be litigated only in the courts of the State of Minnesota, County of Hennepin.

> Executive waives any right the Executive may have to transfer or change the venue of any litigation brought against Executive by the Company.

Section 8.01 of the 1999 Employment Agreement provides that "[t]his agreement is made under and shall be governed by and construed in accordance with the laws of the state of Minnesota."

**1999 Employee Invention Assignment, NonDisclosure and NonCompete Agreement**

TestQuest states that on March 25, 1999, LaFrance signed the Employee Invention Assignment, Nondisclosure And Noncompete Agreement (Inventions Agreement). (Complaint Exh. B.) As with the 1999 Employment Agreement, LaFrance states that he actually signed the Inventions Agreement on March 29, 1999, but was asked to date his signature March 25, 1999. (LaFrance Aff. ¶ 5.) LaFrance also states that he had never seen the Inventions Agreement before having it presented to him for signing. Id. The relevant sections of the Inventions Agreement provide as follows:

> 2.0 Nondisclosure of Confidential Information. At all times during and subsequent to my employment with the Company, I shall keep in strictest confidence and trust the Company's Confidential Information that is disclosed to me or to which I have access. I shall not use or disclose such Confidential Information without the written consent of the Company, except as may be necessary in the ordinary course of performing my duties for the Company. . . .
>
> 10.1 During Employment. I agree that while I am employed by the Company I will not, without the Company's express written consent, engage in any consulting, employment or business within the United States that is competitive with the Company. In furtherance and not in limitation of the generality of the preceding sentence, I shall not, for myself, or on behalf of any person or organization, compete with the Company in the development, manufacture, sale, solicitation or servicing of any then existing product of, or service or business engaged in by the Company, or any

> other product of, or service or business engaged in, or under development by, the Company at the date of termination of my employment.
>
> 10.2 After Termination of Employment. If I have had significant contact with customers of the Company while employed by the Company, or if I have been materially involved in the design, development or implementation of the Company's present or planned major products or services, then I agree that the provisions of section 10.1 shall be expanded to prohibit my competing with the Company within the United States both while I am employed by the Company and for twelve (12) months following the termination of my employment.
>
> 13.1 Entire Agreement: Amendment. This agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understanding. My obligations under this agreement may not be modified or termination (sic), in whole or in part, except in a writing signed by the President of the Company or his or her designee. Any waiver by the Company of a breach of any provision of this agreement shall not operate or be construed as a waiver of any subsequent breach.
>
> 13.5 Injunctive Relief: Attorneys' Fees. Any breach of this agreement likely will cause irreparable harm to the Company for which money damages could not reasonable (sic) or adequately compensate the Company. Accordingly, I agree that the Company shall be entitled to injunctive relief to enforce this agreement, in addition to damages and other available remedies. If the Company institutes any legal action to enforce this agreement against me, the prevailing party in such legal action shall be entitled to recover its reasonable attorney's fees and legal costs thereby incurred.

In August of 2000, LaFrance was made TestQuest's Area Vice President and negotiated a new employment agreement. (Complaint ¶¶ 20-21, and Exh. C.) On August 31, 2000, LaFrance executed his new Employment Agreement (2000 Employment Agreement). Id. The 2000

Employment Agreement expressly revoked the 1999 Employment Agreement. Section 6 of the 2000 Employment Agreement states, however, "[t]he Employee Inventions Assignment, Non-disclosure and Non-competition Agreement, dated March 25, 1999, which was executed by Executive at the time he became employed by the Company (the "Inventions Agreement") is hereby ratified and confirmed by Executive in all respects." The relevant forum-selection and choice-of-law sections of the 2000 Employment Agreement provide as follows:

> 8.2 Resolution of Certain Claims - Injunctive Relief. Section 8.1 shall have no application to the claims by the Company asserting a violation of section 7.7 or seeking to enforce, by injunction or otherwise, the terms of section 7.7 or the Inventions Agreement and, subject to this section, such claims may be maintained by the Company in a lawsuit in a court of law or equity. Executive agrees that, in addition to, but not to the exclusion of any other available remedy, the Company shall have the right to enforce the provisions of section 7.7 or the Inventions Agreement by applying for and obtaining temporary and permanent restraining orders or injunctions from a court of competent jurisdiction without the necessity of filing a bond therefore, and the Company shall be entitled to recover from the Executive its reasonable attorneys' fees and costs in enforcing the provisions of section 7.7 or the Inventions Agreement. Any action at law, suit in equity, or judicial proceeding arising directly, indirectly, or otherwise in connection with, out of, related to or from this agreement or any provision hereof, shall be litigated only in the courts of the State of Minnesota, County of Hennepin. Executive waives any right the Executive may have to transfer or change the venue of any litigation brought against Executive by the Company.
>
> 9.1 Governing Law. This agreement is made under and shall be governed by and construed in accordance with the laws of the state of Minnesota.

In October 2001, TestQuest terminated LaFrance's employment "without cause" due to "financial circumstances." (Complaint ¶ 22.) At some point subsequent to his termination,

LaFrance established WAVS and began pursuing employment in California. His potential customers and clients are located primarily in California and Texas, and he states that none of his business activities on behalf of WAVS have occurred in Minnesota. (LaFrance Aff. ¶ 14.) LaFrance states that in December 2001, he moved to California and began subletting a room from his sister in law. (LaFrance Aff. ¶ 11.) LaFrance states that although he did not believe the Inventions Agreement and its non-compete provisions were enforceable, or that his current work violated them, he was nonetheless forced to disclose them to potential employers and clients. Because this disclosure hindered his ability to find gainful employment, LaFrance states that he brought his California suit seeking a declaratory judgment that the non-compete provisions of the Inventions Agreement were unenforceable and did not restrict his ability to find gainful employment individually or through WAVS. (LaFrance Aff. ¶ 13.) He notes that TestQuest had not contacted him or sent any type of cease and desist demand to him prior to his initiating suit on January 24, 2002. (LaFrance Aff. ¶ 14.)

On January 9, 2002, LaFrance sent a personal email to a TestQuest employee listing himself as "President/CEO" of WAVS, Inc. (WAVS) with an address in San Diego California. (Hammell Aff. ¶ 7 & Exh. B.) TestQuest states that LaFrance then brought the California suit upon realizing that TestQuest was aware he was violating obligations under the 2000 Employment Agreement and the Inventions Agreement.

**2. <u>Facts Relevant to LaFrance's Residential Status.</u>**

LaFrance and his wife jointly own a house in Plymouth, Minnesota. (LaFrance Depo. at 8-9.) LaFrance's wife and two children continue to reside in this home. <u>Id.</u> LaFrance and his wife are not separated or estranged in any way. <u>Id.</u> LaFrance also admits that he continues to

spend many days there. Id. They own this house as a "homestead" under Minnesota law, thus benefitting from a lower real estate tax. Id. LaFrance understands that to qualify for homestead status, the house is identified as his residence, and he has not attempted to change the tax status of his house. Id. LaFrance has not shipped any of his belongings from Minnesota to California, and he keeps the majority of his clothing at his Minnesota home. Id. at 12-13 & 18.

In December 2001, LaFrance negotiated a second mortgage on his home. Id. at 9-12. The loan came from Marquette Capital Bank, a Minnesota bank. (Hammell Aff. Exh. E.) LaFrance later admitted that on the date he negotiated the mortgage, it was his understanding that the Plymouth home would be his personal residence. (LaFrance Depo. at 11-12.)

LaFrance and his wife maintain a joint account at TCF bank in Minnesota, and their checks list the Minnesota residence as their address. Id. at 32-34. All three of the vehicles LaFrance owns are located in Minnesota and have Minnesota license plates. Id. at 27. In December 2001, LaFrance received medical treatment from a doctor in Minnesota. Id. at 36-37. LaFrance pays only Minnesota income tax, and as of his February 8, 2002 deposition, he had paid no California taxes other than sales tax since living in the state approximately seven years ago. Id. at 29-30. Also as of February 8, 2002, LaFrance had earned no income in California. Id. at 31.

LaFrance owns no home or other real estate in California. Id. at 14-15. Other than some clothing, he owns no assets in California. Id. at 38. LaFrance owns a condominium in Dallas, Texas, where he lived prior to working for TestQuest. Id. Monthly rental checks from that property, and all other correspondence from the Texas property management company he uses are sent to his address in Minnesota. Id. LaFrance also uses his Minnesota address for all his

credit cards, and all his bills and statements are sent there. Id. at 38. The Minnesota address is listed on all his investment and retirement accounts, with bills and statements being sent there. Id. at 35. LaFrance has no California bank accounts. Id. at 32-34. Because he has no car in California, he rents or borrows one when necessary. Id. at 36-37. LaFrance has no doctor or other medical professional in California. Id. at 36-37.

LaFrance states that since December 2001 he has had a sublease for his sister-in-law's apartment allowing him to stay in one of the three bedrooms, for which he pays $100 per month. Id. at 15-16. He admits, though, that there is no documentation reflecting the existence of the sublease. Id. During the 70 days from December 2001 through February 8, 2002, LaFrance spent more days and nights in Minnesota than in California. Id. at 22-24. LaFrance has two phone lines listed in Minnesota, and uses one of them for sending and receiving faxes including those related to WAVS. Id. at 25-27. He also has a Minnesota cell phone account and email provider. Id. at 25-27 & 40.

On December 31, 2001, prior to the initiation of any lawsuit, LaFrance sent an email to Betsy Sullivan, the Controller at TestQuest, informing her, "I've got a place in San Diego now and I'm in the process of moving there." (LaFrance Aff.; Exh. A.). Both LaFrance and his wife's affidavits state that the family chose California because it presented job opportunities, they had previously lived there, and his wife grew up in California and still had family there.

LaFrance has a California cell phone with the number personally listed in California. (LaFrance Depo. at 20.) On January 11, 2002, LaFrance applied for a California driver's license. Id. at 28. The same day, he also applied for a passport in California. Id. at 39. On February 7, 2002, LaFrance registered to vote in California. Id. at 28. He admits, however, that he never

registered to vote while living in Minnesota, that he did not vote in the last four years, and that he can not remember whether he has voted in the last ten years. Id. LaFrance also admitted that before he registered to vote, he knew he was going to be deposed. Id.

LaFrance has not incorporated WAVS in California or in any other state. Id. at 40-42. He has filed no papers with the State of California to be licensed and permitted to do business there. Id. WAVS has no office; the address listed on its website is a post box at a Mail Boxes Etc. store. Id. at 39-40. LaFrance also lists his California cell phone number as his business phone. (Hammell Aff.; Exh. B.)

**C. Discussion.**

> When plaintiff brings a timely motion to remand defendant bears the burden of proof of showing the action was properly removed. *Gorman v. Abbott Laboratories*, 629 F.Supp. 1196, 1203 (D.R.I.1986). All doubts as to the propriety of removal are to be resolved in favor of the plaintiff. *Abbott*, 629 F.Supp. at 1203. In determining whether to remand the Court must construe the removal statute against removal and in favor of remand as well as give due consideration to the stage of the litigation in the state court. *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108-09, 61 S.Ct. 868, 874, 85 L.Ed. 1214 (1941); *Boland v. Bank Sepah-Iran*, 614 F.Supp. 1166, 1169 (S.D.N.Y.1985). This stringent approach rests on "principles of federalism, comity, and the sovereignty of the several states." *Abbott*, 629 F.Supp. at 1203. In addition it stems from a concern for avoidance of wasting judicial resources, particularly since a defendant who moves for removal may later challenge the existence of federal jurisdiction if unhappy with the results obtained. *Harrell v. Reynolds Metals Co.*, 599 F.Supp. 966 (N.D.Ala.1985); *Belle View Apts v. Realty Refund Trust, 602 F.Supp. 668* (4th Cir.1979); see also *Boland*, 614 F.Supp. at 1169-70 (permitting removal after extensive motion practice would be waste of judicial resources).

Johansen v. Employee Benefits Claims, Inc., 668 F.Supp. 1294, 1295-96 (D. Minn. 1987).

**1. Subject Matter Jurisdiction.**

"The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between- . . . (1) citizens of different states." 28 U.S.C. § 1332(a). "For purposes of diversity jurisdiction, the terms 'domicile' and 'citizenship' are synonymous." Yeldell v. Tutt, 913 F.2d 533, 537 (8th Cir. 1990) (citations omitted). "Section 1332(a) must be strictly construed, in view 'of the constitutional limitations upon the judicial power of the federal courts, and of the Judiciary Acts in defining the authority of the federal courts when they sit, in effect, as state courts.'" Sheehan v. Gustafson, 967 F.2d 1214, 1215 (8th Cir. 1992) quoting Indianapolis v. Chase Nat'l Bank, 314 U.S. 63, 76 (1941). "A defendant seeking to remove an action to federal court on the basis of diversity jurisdiction must normally demonstrate that diversity existed both at the time the action was filed and at the time removal is sought." Graff v. Qwest Communications Corp., 33 F.Supp.2d 1117, 1119 citing Freeport-McMoRan, Inc. v. K.N. Energy, Inc., 498 U.S. 426, 428 (1991).

"To establish domicile, an individual must both be physically present in the state and have the intent to make his home there indefinitely." Yeldell, 913 F.2d at 537 (citations omitted). "[T]he parties seeking a federal forum, have the burden of establishing jurisdiction by a preponderance of the evidence." Id.

The Eighth Circuit has considered a wide range of facts when determining domicile. See e.g. Sheehan, 967 F.2d at 1215 (considering location of bank and investment accounts, ownership of property in the state, location and registration of vehicles, location of offices, where party checks for mail and messages, location of physician and attorney, state of driver's license, address listed on tax returns, passport, and voter registration); Yeldell, 913 F.2d at 537

(considering amount of time spent in each state, location of commercial activity, state of incorporation of business, and address listed for business and on business documents).

Plaintiff asserts that the Court lacks subject matter jurisdiction over the present case because there is no diversity of citizenship between the two parties. Plaintiff cites federal case law to support its statement that "a person's own statements concerning his or her intentions are relevant, but they are given only limited weight if they conflict with objective facts that tend to support a finding of a contrary intent." Plaintiff then cites Moore's Federal Practice for the proposition that, "[a] plaintiff who claims to have changed his or her domicile in favor of a new one bears a heavy burden of establishing the new domicile." Plaintiff contends that Defendant did not carry this burden, and has merely alleged in a conclusory fashion that he is residing and domiciled in California.

In making this argument, Plaintiff emphasizes the following facts. Defendant: (1) owns his home as a "homestead" and has taken no steps to alter that status; (2) has spent more days and nights in Minnesota than in California since the point at which he states he became a California resident; (3) negotiated another mortgage on his Minnesota house in December 2001, understanding at that time it would be his residence; (4) has shipped no belongings to California, the only property he possesses there being some clothing; (5) has a Minnesota bank account with a Minnesota address on his checks; (6) uses his Minnesota address for receiving rental checks, retirement and brokerage accounts, and all credit cards and charge cards; (7) obtains medical care only in Minnesota; (8) pays taxes only in Minnesota; and (9) primarily has telephones and emails in Minnesota.

Plaintiff adds that Defendant's California driver's license, voter registration, and filing for

a passport are merely an attempt to persuade the Court he is a California resident. Finally, Plaintiff argues that the rationale for diversity jurisdiction does not apply to Defendant, because "[i]t is not likely that LaFrance, who still maintains a home in Minnesota, whose family still lives in the state, will suffer prejudice at the hands of a Minnesota state court."

Defendant responds that he is a California resident, and diversity of citizenship does exist. He quotes the Eighth Circuit's language in Bruton v. Shank, 349 F.2d 630 (8th Cir. 1965), that when physical presence in a state and the intention to make it the present home both occur, "the change in domicile is instantaneous." Therefore, he does not fail to be a California resident simply because he only moved there recently.

Defendant states that the following facts demonstrate he is clearly present in California: his (1) renting a room from his sister in law; (2) moving personal belongings necessary for work and living to that residence; (3) spending the majority of time at that residence as of January 2002; and (4) setting up a business headquartered in San Diego.

Defendant maintains that the following facts demonstrate he possessed an intent to make California his present home: he (1) and his wife have attested under oath that he moved to California in December 2001; (2) and his wife told people he had moved to San Diego; (3) spent the majority of his time since the beginning of 2002 in San Diego; (4) established a new business headquartered in San Diego; (5) applied for jobs in San Diego; (6) obtained a California driver's license and was consequently required to surrender his Minnesota driver's license; (7) obtained a passport using his California address; and (8) registered to vote using his California address.

Defendant notes that, under Bruton, his motive for moving is irrelevant. In response to the details of his home situation, Defendant states they show he "was simply making sound

prudent financial decisions regarding issues arising out the fact that he moved to California prior to the rest of his family." Defendant states that he and his wife decided it would be better to allow the children to finish the school year in Minnesota, and it would be easier to sell the house in the Spring. Defendant explains that he and his wife took out a second mortgage in order to finance his move to California. Further, it would make no sense to alter his homestead exemption prior to selling his house, because it is jointly owned by his wife. In addition, it would be pointless to change bank accounts or relevant addresses for bills and statements prior to his family moving, because his wife handles the majority of the home finances. As to the surgery, Defendant explains that it was scheduled prior to his move, and his medical insurance, which he was continuing through TestQuest, required it take place in Minnesota. Finally, it would make no sense to cancel Minnesota phones while his wife and children are still in Minnesota using them.

Defendant emphasizes that he and his family moved in the same fashion when he began working for Plaintiff. He explains that in Minnesota Mining and Mfg. v. Kerkevold, 87 F.R.D. 317 (D. Minn. 1980), the "court obviously recognized that the logistics of moving a family often times requires one spouse to move before his or her family can move." Accordingly, Defendant argues that the Court should follow the same reasoning in the present case, and recognize that the facts do not contradict his stated intent to live in California.

The Court recommends finding that Defendant is a Minnesota resident, and therefore, diversity jurisdiction does not exist in the present case. Defendant emphasizes that in a sworn affidavit he has stated that he resides in California, and he and his wife intend for the family to live there. That alone is not enough, however, and the Court must consider the objective factors

as well when determining his domicile. See Russell v. New Amsterdam Cas. Co., 325 F.2d 996, 999 (8th Cir. 1964) (finding a statement of intent loses significance when in conflict with the facts of residency). If stated intent were sufficient, there would have been no reason for the courts in any of the above-mentioned cases to consider any factors beyond the statements of the parties claiming diversity jurisdiction.

Defendant has spent a similar amount of time in Minnesota in the previous three months as in California. He continues to own his home in Minnesota, and with the exception of pursuing business in California, his living situation here is virtually unchanged from the last date on which he would agree he resided here. Further, many of the facts Defendant presents to demonstrate he is a California resident depend more on his stated intent than his actual presence. Defendant could obtain his California driver's license, list a California address on his passport application, and obtain a California cell phone account and post box at Mailboxes Etc. without having to reside in California for any significant period. He also has provided no actual documentation that he is formally renting a room from his sister in law.

It is true that a party may become a resident of another state purely for jurisdictional purposes, and that there is no minimum period of time necessary to establish a new domicile. See Bruton 349 F.2d at 633 (stating the motive behind a person's choice of present home is irrelevant); Kirkevold, 87 F.R.D. at 320 (when physical presence of a person at the place of domicile is coupled with the intention of making it his present home, change in domicile is instantaneous). Therefore, the Court is not discounting Defendant's evidence simply because he performed many of those acts immediately before filing his own suit, or being deposed by Plaintiff.

Moreover, case law demonstrates that a breach in marriage is no longer necessary for one spouse to acquire a separate domicile from the other. Hence, LaFrance's family could continue to reside in Minnesota while he genuinely became a California resident. The Court also appreciates the difficulties of moving an entire family, and that the process can be a lengthy one. But even that lengthy process will usually contain many more corroborative facts than Defendant has produced in the present case. The quotation from Kirkevold serves to illustrate the significant differences between it and the present case:

> In mid-November, Kirkevold and Sally Kirkevold, his wife, spent two days meeting with realtors and searching for a house to purchase in the San Jose, California area. At the time, the Kirkevolds also explored the educational opportunities in the San Jose area for their children. On November 23, 1979, the Kirkevolds listed their house at 1049 Sprucewood Avenue in Woodbury, Minnesota for sale through a local realtor. During late November, Kent Kirkevold sold various items which he perceived would not be useful in California, and purchased various items he thought might be necessary in California. On November 27th, defendant Kirkevold left the employ of 3M, where he had been employed since 1964 in various technical capacities. Three days later, on November 30th, Kent Kirkevold packed most, but not all, of his personal belongings in his car and drove to California to begin his new employment with Verbatim. Kirkevold commenced his new employment with Verbatim on December 3rd, and has been employed there continuously to the present time. Upon arriving in California, Kirkevold rented and moved into a one bedroom apartment in Sunnyvale, California. Other than to attend his deposition, defendant Kirkevold has not returned to Minnesota.

87 F.R.D. at 319. Defendant in the present suit has performed none of the same acts, which might corroborate his California residency, or explain his peculiarly consistent presence in Minnesota. While Defendant may be intending to live in California indefinitely, the current facts suggest he is intending to live there in the future, rather than currently residing there. Hence, he has failed to demonstrate diversity jurisdiction by a preponderance of the evidence. The Court,

therefore, recommends finding that diversity subject matter jurisdiction does not exist, and that this case be remanded pursuant to 28 U.S.C. 1447(c).

**2. Forum Selection.**

> This court interprets *Ricoh* (Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. 22 (1988)) to require that federal courts sitting in diversity apply federal law when analyzing contractual forum selection clauses in the context of dismissal motions as well as transfer motions. When an arguably procedural issue is addressed by one of the Federal Rules, this court must apply the Federal Rule unless it is constitutionally defective. *Hanna v. Plumer*, 380 U.S. 460, 471, 85 S.Ct. 1136, 1144, 14 L.Ed.2d 8 (1965).

Knutson v. Rexair, Inc., 749 F.Supp. 214, 216 n.1 (D. Minn. 1990).[1] "Forum selection clauses are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable or unjust or the clause is shown to be invalid for such reason as fraud or overreaching." Taylor Investment Corp v. Weil, 169 F.Supp.2d 1046, 1060-61 (D. Minn. 2001) quoting M/S Bremen v. Zapata Off- Shore Co., 407 U.S. 1 (1972).

> The Supreme Court has construed this exception narrowly. A forum selection clause is unreasonable if (1) its incorporation into the contract was the result of fraud, undue influence, or overweening bargaining power, *Carnival Cruise Lines*, 499 U.S. at 591, 111 S.Ct. at 1526; *Bremen*, 407 U.S. at 12-13, 92 S.Ct. at 1914; (2) the selected forum is so "gravely difficult and inconvenient" that the complaining party will "for all practical purposes be deprived of its day in court," *Bremen*, 407 U.S. at 18, 92 S.Ct. at 1917; or (3) enforcement of the clause would contravene a strong public policy of the forum in which the suit is

---

[1]The Third Circuit has called into question whether federal common law should control the enforceability of forum selection clauses. See e.g. General Eng'g Corp. v. Martin Marietta Alumina, Inc., 783 F.2d 352, 356 (1986). The Eighth Circuit has not addressed whether the enforceability of forum selection clauses is governed by state or federal law. Plaintiff correctly notes, however, that the Minnesota federal and state standards do not differ. See Hauenstein & Bermeister, Inc. v. Met-Fab Indus., Inc., 320 N.W.2d 886, 890-91 (Minn. 1982) (citing Bremen as authority for factors to consider when determining reasonableness of forum selection clause).

> brought. *Id.* at 15, 92 S.Ct. at 1916. To establish the unreasonableness of a forum selection clause, Appellants have the "heavy burden of showing that trial in the chosen forum would be so difficult and inconvenient that the party would effectively be denied a meaningful day in court." *Pelleport*, 741 F.2d at 281 (citing *Bremen*, 407 U.S. at 18, 92 S.Ct. at 1917).

Argueta v. Banco Mexicano, S.A., 87 F.3d 320, 325 (9th Cir. 1995).

A defendant may contractually waive the right to remove a case, but "[w]aiver of the right to remove must be 'clear and unequivocal,' 1A J. Moore, B. Ringle & J. Wicker, Moore's Federal Practice ¶ 0.157[9] (2d ed. 1987) Moore's Federal Practice ¶ 0.157[9] (2d ed. 1987)." Weltman v. Silna, 879 F.2d 425, 427 (8th Cir. 1989).[2]

Plaintiff argues that the forum selection clause in the 2000 Employment Agreement requires that the present case be remanded to Minnesota State Court, Hennepin County. It states that the present dispute clearly falls within the scope of the clause. The limiting term "only," according to Plaintiff demonstrates this is a mandatory forum selection clause, and consequently, Defendant waived any right to litigate in other venues. Further, the clause also contains an explicit waiver of rights. Plaintiff concedes that the Inventions Agreement does not contain its own forum selection clause. But according to Plaintiff, section 31.1 allows it to be amended in certain instances, and the 2000 Employment Agreement was such an instance.

Plaintiff explains that the title and text of section 8.2 of the 2000 Employment Agreement make clear that the forum selection clause applies to the present type of suit. More specifically,

---

[2]In Foster v. Chesapeake Insur Co., Ltd., 933 F.2d 1207, 1218 n.15 (3rd Cir. 1991), the Third Circuit found that under *Moore*'s rationale, the standard should be clear and unequivocal in the context of litigation-based waiver, but that the standard need not be as high for contractual waiver. This distinction in standards is not important for the present case, because the waiver language in question is clear and unequivocal.

section 8.1 requires that disputes resulting from the 2000 Employment Agreement be resolved through arbitration. Section 8.2 according to Plaintiff, begins by carving out an exception to that rule in the case of the terms of section 7.7 or the Inventions Agreement. Section 8.2 explicitly states that such disputes may be brought in a court of law or equity. The end of section 8.2, according to Plaintiff, then limits the venue for such disputes to Minnesota State Court, Hennepin County.

Plaintiff states that Defendant voluntarily entered into both the 1999 and 2000 Employment Agreements after negotiating back and forth over the terms, and, in the case of the 1999 Employment Agreement, consulting an attorney. Therefore, he should be bound by the forum selection clause.

Defendant responds that he has not waived his right to remove the present suit. He explains that the current dispute arises from the Inventions Agreement, which does not contain a forum selection clause. He contends that the 2000 Employment Agreement's forum selection clause does not govern disputes under the Inventions Agreement. Defendant argues that the language in both agreements demonstrates they are separate. The merger clause in section 13.1 of the Inventions Agreement states that it represents the entire agreement of the parties with respect to the Inventions Agreement. Section 13.4 states it is not an employment contract. Section 13.5 discusses the type of relief which can be sought. And finally, section 13.6 contains a choice of law provision.

Section 6 of the 2000 Employment Agreement states that the Inventions Agreement is "ratified and confirmed . . . in all respects." Section 9.2 states "this agreement and the separate Inventions Agreement contains the entire agreement of the parties." Defendant also explains that

section 8 refers to the Inventions Agreement as a separate agreement three times. Defendant further stresses that the forum selection clause at the bottom of section 8.2 is limited to "any action at law, suit in equity, or judicial proceeding arising directly, indirectly, or otherwise in connection with, out of, or related to this agreement." Defendant concludes, "the Inventions Agreement, which does not contain a forum selection clause, is not subject to this forum selection clause, which by its own terms only applies to the Second Employment Agreement (2000 Employment Agreement)."

Defendant also argues that enforcement of the forum selection clause would be unjust, because it resulted from unequal bargaining power, and is so one-sided that it is unconscionable. Defendant states that he was not given any meaningful opportunity to negotiate the clause and was not advised to seek legal counsel regarding its effect. In addition, Defendant states that the clause allows Plaintiff to initiate an action wherever it wants, but limits him to Minnesota State Court. According to Defendant, the clause also purports to waive his right to a bond to secure any temporary injunctive relief obtained by Plaintiff, and purports to allow Plaintiff to recover attorneys' fees in any action between it and him regardless of who prevails. He concludes, "the clause is substantively unreasonable and clearly could not be the product of equal bargaining."

The Court finds the forum selection clause in the 2000 Employment Agreement requires that the present case be heard exclusively in Minnesota State Court, Hennepin County. Section 8.2 specified that any disputes arising out of the Inventions Agreement must be litigated only in that court, and by signing the 2000 Employment Agreement, Defendant was waiving any right to litigate in any other venue. The first third of section 8.2 functions to carve out an exception to the mandatory arbitration requirement of section 8.1. The second third details the procedure

Plaintiff may use to enforce the Inventions Agreement. The final third limits all of this litigation to Minnesota State Court, Hennepin County.

There are certain shortcomings to the wording of section 8.2. It is not clear, for example, why when detailing the injunction procedure, the contract refers to a "court of competent jurisdiction," without already specifying that such a court would have to be the Minnesota State Court in Hennepin County. But this overly general term does not contradict the later venue restriction at the end of section 8.2. Nor does it imply that some other interpretation of the entire section is more likely. More importantly, Defendant does not claim to have misunderstood the wording of section 8.2. He argues instead that the terms of the clause are unconscionable, and that the clause should not govern disputes arising under the Inventions agreement.

With respect to the Inventions Agreement itself, section 13.1 does allow for modification by a writing signed by Plaintiff's president or his or her designee. Therefore, its lack of an internal forum selection clause does not mean that it can not be limited by an appropriate writing such as the 1999 or 2000 Employment Agreements. The Employment Agreements' explicit references to the Inventions Agreement, and their requirement that the Inventions Agreement also be executed, indicate the two agreements are designed to function together. Further, when Defendant signed the 1999 Employment Agreement he did so at the same time he was signing the Inventions Agreement. Hence, it would have been reasonable for Defendant to consider the relationship of the two agreements when he agreed to sign them

Case law also supports finding the forum selection clause governs the present claim. After reviewing extensive federal case law, the Eight Circuit determined that "forum selection clauses referring to claims 'hereunder' or 'under the agreement' can be broad enough to cover

contract-related tort claims." Terra Int'l, Inc. v. Mississippi Chem. Corp., 119 F.3d 688, 694 (8th Cir. 1997). In the present case, the litigation is not as peripheral as a tort claim. Instead, it is the subject of the Inventions Agreement, which is explicitly referred to in the forum selection clause. Further, the language of the present forum selection clause is even broader than that in Terra. Section 8.2 of the present case includes any action "arising directly, indirectly, or otherwise in connection with, out of, related to or from this agreement."

With respect to the terms of the forum selection clause, the Court does not find them unreasonable. By the terms of the clause, all suits must be brought in Hennepin County. Hence, both parties are limited; Defendant is not the only party surrendering the right to litigate elsewhere. There are also no allegations of fraud, and Defendant was not prevented from negotiating the terms. The affidavits submitted imply that Defendant had the help of an attorney when negotiating the 1999 Employment Agreement, but the record is not entirely clear. Regardless, Defendant is an experienced professional who was accepting the offer to become a high ranking executive. It is unreasonable to conclude that Plaintiff possessed overwhelming bargaining power.

Further, Hennepin County is certainly not so "gravely difficult and inconvenient" a forum that Defendant would be deprived of his day in court by having to litigate there. Defendant still owns a house in Plymouth, Minnesota where his family lives and where he spends significant amounts of time. There is also no public policy which would be contravened by requiring the suit be brought in Hennepin County. Therefore, Defendant can not carry the heavy burden of demonstrating that he would be denied a meaningful day in court if he were forced to litigate in Hennepin County. As a result, the Court recommends finding that the forum selection clause is

valid and requires the present suit be brought in Minnesota State Court, Hennepin County.

## II DEFENDANT'S MOTION TO STAY OR IN THE ALTERNATIVE TRANSFER CASE

### A. First-Filed Rule.

"To conserve judicial resources and avoid conflicting rulings, the first-filed rule gives priority, for purposes of choosing among possible venues when parallel litigation has been instituted in separate courts, to the party who first establishes jurisdiction." Northwest Airlines, Inc. v. American Airlines, Inc., 989 F.2d 1002, 1006 (8th Cir. 1993). "In the absence of compelling circumstances, the court initially seized of a controversy should be the one to decide the case." Orthmann v. Apple River Campground, Inc., 765 F.2d 119, 121 (8th Cir. 1985) quoting Merrill Lynch, Pierce, Fenner & Smith v. Haydu, 675 F.2d 1169, 1174 (11th Cir.1982). An example of compelling circumstances is when the second action has developed further than the first. See Northwest Airlines v. American Airlines, Inc., 792 F.Supp. 655, 658 (D. Minn. 1992) citing Orthmann, 765 F.2d at 121.

Defendant argues that under the first-filed rule, the Court should stay the present action in favor of the California suit, or transfer it there. He states that: (1) the California suit was filed first; (2) the California court has jurisdiction over both parties; and (3) the California court has already set a briefing schedule to consider TestQuest's challenge to venue.

The Court finds that the first-filed rule should not apply to the present case, because the Minnesota suit has developed further than the California suit. It will not conserve judicial resources for this Court to stay the present action, or transfer it, when it has already had the jurisdictional issue thoroughly presented to it. The Court has already granted expedited discovery related to the jurisdiction issue, received briefing from both parties, and conducted a

hearing on the issue. In contrast, the California court has denied a motion by LaFrance for a TRO, and set a briefing schedule for TestQuest's motion to dismiss.

Because the Court lacks subject matter jurisdiction over the present suit, it must remand the case, rather than taking any other action. See 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."). Further, the forum selection clause limiting litigation to Minnesota State Court in Hennepin County, and the lack of federal subject matter jurisdiction make transferring the present case to Federal District Court in California improper. See United States v. Copley, 25 F.3d 660, 662 (8th Cir. 1994) (finding "[a] district court may transfer a civil action only to a district in which the action 'might have been brought.' 28 U.S.C. § 1404(a)." Therefore, the Court recommends denying Defendant's motion with respect to both staying the case and transferring it.

Based upon the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED that:**

(1) Plaintiff's Motion to Remand (Doc. No. 2) be **GRANTED**;

(2) Defendant's Motion to Stay, or in the alternative to Transfer Case (Doc. No. 5) be **DENIED**.

Dated: March 26, 2002.

SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by April 5, 2002, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.